IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LEROY ORANGE,                        )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        No. 04 C 0168
                                     )
JON BURGE, et al.,                   )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On January 10, 2003, plaintiff Leroy Orange ("Orange") was pardoned by then-Governor

George H. Ryan, after serving nineteen years on death row for a crime Orange says he did not

commit. Orange promptly filed a civil rights lawsuit against numerous defendants, including Cook

County State's Attorney Richard A. Devine ("Devine"). Orange claims that Devine is liable under

42 U.S.C. § 1983 for depriving Orange of his right to a fair trial and for Orange's wrongful

conviction (Count I). Orange also claims under state law that Devine is responsible for false

imprisonment (Count VII), malicious prosecution (Count VIII), intentional infliction of emotional

distress (Count IX), and conspiracy (Count X).[1] Devine's Second Amended Motion for Summary

Judgment (Dkt. No. 481) is now before the court. For reasons set forth in the analysis that follows,

Devine's motion is granted and all remaining claims against Devine are dismissed with prejudice.

---

[1] Orange's § 1983 claim for false arrest/false imprisonment (Count II) was dismissed on
statute of limitations grounds. (8/11/2006 Order at 11, Dkt. No. 242.) Orange's § 1983 claim
for deprivation of access to the courts (Count V) was dismissed for failure to state a claim.
(3/30/2005 Order at 17, 34, Dkt. No. 71.)

When ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007). The following facts are construed in the light most favorable to Orange.

1.    General Background and Underlying Criminal Case

On January 11, 1984, four individuals were murdered at an apartment in Chicago. (Def.'s R. 56.1(a)(3) Stmt. ¶ 12.) Orange was arrested for the murders on January 12, 1984, and transported to Area 2 headquarters for questioning. (*Id.* ¶ 13.) On January 12 and 13, 1984, while being interrogated, Orange was tortured with electric shock, "bagged," and beaten by Area 2 Commanding Officer Jon Burge ("Burge") and certain police officers serving under Burge, with the knowledge of Assistant State's Attorney Dennis Dernbach ("Dernbach").[2] (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 47.) Eventually, Orange gave a false statement to Dernbach, confessing to the murders. (*Id.* ¶ 48; Def.'s R. 56.1(a)(3) Stmt. ¶ 14.)

On May 24, 1985, Orange was convicted on multiple counts arising from the four murders and sentenced to death. (Def.'s R. 56.1(a)(3) Stmt. ¶ 15; 1st Am. Compl. ¶ 39.) On appeal, the Supreme Court of Illinois affirmed the majority of Orange's convictions and his sentence. (*Id.* ¶ 16;

---

[2] The court recognizes that many of the facts surrounding Orange's interrogation and confession are potentially disputed between Orange and defendant Dernbach. Because defendant Devine is not alleged to have been directly involved in Orange's arrest or interrogation, the court accepts as true Orange's version of the events for purposes of ruling on this motion. Therefore, for purposes of ruling on this motion, the court views the facts in Orange's favor and accepts that Orange was tortured at Area 2 in January 1984 and falsely confessed. The court notes that Orange has settled all of his claims against the individual City of Chicago police officers.

*People v. Orange*, 521 N.E.2d 69 (1988) ("*Orange I*").)

Orange filed a petition for post-conviction relief, alleging *inter alia* that he was the victim of torture at Area 2. (Def.'s R. 56.1(a)(3) Stmt. ¶ 17.) Orange's post-conviction petition was dismissed by the trial court without an evidentiary hearing. (*Id.* ¶ 18). On appeal, the Supreme Court of Illinois found that Orange's trial counsel was not ineffective for failing to investigate Orange's allegations of torture and, alternatively, that Orange was not prejudiced because the evidence before the court did not corroborate Orange's allegations of torture. (*Id.*; *People v. Orange*, 659 N.E.2d 935 (Ill. 1995) ("*Orange II*").) The court remanded the amended petition for purposes of determining whether Orange received ineffective assistance of counsel during his capital sentencing hearing. (Def.'s R. 56.1(a)(3) Stmt. ¶ 19.) Before the proceedings in the trial court were concluded, Governor Ryan pardoned Orange on January 10, 2003.[3]

2.    <u>Devine's Involvement with the Orange Case</u>

Devine served as First Assistant State's Attorney of Cook County from 1980 to 1983. (Def.'s R. 56.1(a)(3) Stmt. ¶ 10.) In 1983, Devine left the Cook County State's Attorney's Office. (*Id.* ¶ 11.) During the period of 1984 through 1988, the time of Orange's arrest, interrogation, trials, and direct appeal, Devine was not employed by the Cook Count State's Attorney's Office. (*Id.* ¶¶ 11, 32.)

Devine was in private practice at the Foran law firm from late 1983 through 1985, when he joined the law firm of Phelan, Pope & John as a partner. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 53.) William Kunkle ("Kunkle"), who served as Chief Deputy of the Cook County State's Attorney's

_____

[3] Orange also filed a second post-conviction petition, which was denied by the trial court on September 29, 1998. The Supreme Court of Illinois affirmed the denial on April 19, 2001. *People v. Orange*, 749 N.E.2d 932, 938 (Ill. 2001) (*Orange III*).

Office during the time Devine was First Assistant State's Attorney, also joined Phelan, Pope & John as a partner in 1985. (*Id.* ¶¶ 3, 53.) While at Phelan, Pope & John, Kunkle was retained as a special state's attorney to retry the *Wilson* criminal case.[4] (*Id.* ¶ 55.) Kunkle was also engaged, in 1988, as special corporation counsel by the City of Chicago to defend the individual Area 2 defendants, including Burge, against Wilson's allegations of civil rights violations arising from his alleged torture at Area 2. (*Id.* ¶ 60; Def.'s R. 56.1(a)(3) Stmt. ¶ 41.) Kunkle later represented Burge and other Area 2 officers in administrative proceedings before the Police Board. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 81.) The money billed by Kunkle for these services went into a general fund at Phelan, Pope & John, from which the partner's draws were paid. (*Id.* ¶¶ 56, 79, 81.)

Kunkle was the lead attorney for Phelan, Pope & John on the *Wilson* civil case. (Def.'s R. 56.1(a)(3) Stmt. ¶ 43.) In his capacity as lead attorney, Kunkle supervised a team of approximately twenty-five lawyers and paralegals. (*Id.*) Kunkle's team billed a total of 4,960.75 hours over a period of more than four years for work performed on the *Wilson* civil case. (Def.'s R. 56.1(a)(3) Stmt. ¶ 61.) Devine did not file a written appearance as an attorney of record in the *Wilson* civil case, nor did he sign or file any pleadings, motions, or memoranda with the court in connection with the *Wilson* civil case. (*Id.* ¶¶ 45, 49, 57, 58.) With regard to the *Wilson* civil case, Devine did not: (1) take part in any confidential client meetings with the City of Chicago or any Area 2 police

---

[4] Andrew Wilson was arrested on February 14, 1982 and confessed to the murder of two Chicago police officers. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 18.) In 1987, Wilson's conviction and death sentence were reversed by the Supreme Court of Illinois on the grounds that the state failed to provide clear and convincing evidence that Wilson's confession was voluntary. (*Id.* ¶ 54; *People v. Wilson*, 506 N.E.2d 571, 576 (Ill. 1987).) Wilson has alleged that he was tortured at Area 2 upon his arrest. *Wilson*, 506 N.E.2d at 573.

defendants, (*Id.* ¶ 51), (2) have any phone conversations with Burge,[5] (*Id.* ¶ 52), or (3) attend the trial. (*Id.* ¶ 53.) Kunkle testified at his deposition that he did not discuss confidential or privileged matters relating to the underlying facts or allegations of the *Wilson* civil case with Devine. (*Id.* ¶ 54.)

Even so, Devine did have some involvement with the *Wilson* civil case. On one occasion, when Kunkle was out of town, Devine appeared in court to secure a continuance in the case. (*Id.* ¶ 60.) Devine also discussed "matters to be filed," federal court procedures, and jury selection with members of the trial team. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 63.) Devine and Kunkle both stated that Devine's participation in the *Wilson* civil case was limited to procedural issues, and Devine recalled reviewing and commenting on court filings. (Def.'s R. 56.1(a)(3) Stmt. ¶¶ 59, 60.) Kunkle recalled that he discussed strategy with Devine insofar as it related to federal procedures such as 404(b) prior bad acts and severance, and Phelan, Pope & John's timesheets reflect that Kunkle met with Devine to discuss "handling and strategy." (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶¶ 70-71.) In total, over an 11-month period, Devine billed 24.5 hours on the *Wilson* civil case.[6] (*Id.* ¶ 63.)

From 1993 to 1996, Phelan, Pope & John was also paid by the City of Chicago to represent Area 2 police officers in three other lawsuits brought by victims of alleged police torture. (*Id.* ¶ 86.)

---

[5] Devine remembers meeting Burge for the first time during preparations for Wilson's criminal trial. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 29; Devine Dep. p. 213 ln. 19 to p. 214 ln.3.) Devine, however, testified by affidavit that he did not gain any knowledge outside the public record regarding Burge during the time he worked at Phelan, Pope & John. (*Id.* ¶ 55.) Burge has generally taken the Fifth Amendment as to all conversations with Devine. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 28.)

[6] Any timesheets that might have described in more detail the work performed by Devine on the *Wilson* civil case were destroyed in a warehouse fire. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 72.) Devine did not personally retain copies of his time records. (*Id.*)

Although Kunkle was the billing partner for Phelan, Pope & John on the *Wilson* civil case, (Def.'s R. 56.1(a)(3) Stmt. ¶ 43), in February of 1995, the City sent several fee checks for services rendered in defending the Area 2 civil rights cases directly to Devine. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 87.)

In December 1996, Devine left Phelan, Pope & John to become the elected State's Attorney for Cook County. (Def.'s R. 56.1(a)(3) Stmt. ¶ 9.) As State's Attorney, Devine initiated a review of all claims alleging abuse at Area 2. (*Id.* ¶ 75.) Devine's assistants and an outside consultant (whom Devine retained to perform a separate review) concluded that the statute of limitations would bar any prosecution of these claims. (*Id.*) Because of the time bar, Devine did not initiate a substantive investigation into whether a pattern of torture existed at Area 2. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 91.)

At the time Devine became State's Attorney, Orange's second post-conviction petition was pending in the Illinois courts, and Orange had not yet been pardoned. Devine discussed Orange's case, as well as other cases in which criminal defendants claimed to have been tortured at Area 2, with his assistants and supervisors. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 91.) Ultimately, based on the advice he received, Devine concluded that there was insufficient evidence showing that Orange, or any other defendant in the ongoing matters, had been tortured. (*Id.*) Devine had final authority over whether the State's Attorney's Office would offer a reduced sentence to any death row inmate.[7] (*Id.*

---

[7] Orange also claims that Devine opposed the Governor's pardon of Orange in 2003. The citations provided by Orange in support of this assertion direct the court to pages 318 and 552-58 of Devine's 9/27/2006 deposition, as well a January 11, 2003 article from The Daily Southtown, in which Devine is quoted. Devine has not included page 318 or pages 553-57 in his filings with the court. On the record before it, the court has no evidence that "[Devine's] name appears on an opposition to clemency in Plaintiff's case in which Plaintiff is called 'utterly human.'" (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 95.) There is also no evidence demonstrating that Devine was correctly quoted as saying "I think these people are evil. Should these people be among us? I don't think so." (*Id.*) On page 552, Devine affirmed that he generally believes "the process the Governor

¶¶ 90, 95.)

On April 24, 2002, the Presiding Judge of the Criminal Division of the Cook County Court, Judge Paul Beibel, appointed a team of special prosecutors to investigate allegations of torture by Area 2 police officers, having determined that the State's Attorney's Office had a *per se* conflict of interest in investigating these allegations due to Devine's involvement in the *Wilson* civil case while at Phelan, Pope & John. (*Id.* ¶¶ 92-93.)[8] On April 9, 2003, Judge Beibel entered an order removing Devine and the State's Attorney's Office from further involvement in ongoing criminal cases in which the defendants claimed to have been tortured by Burge and others at Area 2. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 96.)

## LEGAL STANDARDS

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once a motion for summary judgment has been filed, the burden shifts to the nonmovant to "show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Technical Group*, 258 F.3d 557, 563 (7th Cir. 2001). "The nonmoving party must show that there is evidence upon which a jury reasonably could find for him; that requirement is not met by producing only a 'mere scintilla' of

---

used was inappropriate and wrong and unfair to victims and their families." (Devine Dep. p. 552, ln. 3-8.)

[8] Because the special prosecutors' conclusions do not impact the court's final analysis of the pending motion, the court need not recount these conclusions insofar as they relate to Wilson's torture, Orange's torture, a pattern of torture at Area 2, or the handling of Wilson's criminal case by Devine, Kunkle, and others.

evidence." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). When ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor. *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007). The court does not make credibility determinations or weigh conflicting evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Summary judgment will be granted in favor of the moving party if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

To prevail on a § 1983 claim, a plaintiff must prove that the defendant (1) deprived the plaintiff of his or her federal constitutional right; and (2) acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)) (emphasis in original).

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that a criminal defendant's constitutional right to due process is violated when the government fails to disclose evidence that is favorable to the accused and material to the question of either guilt or punishment. A *Brady* violation has three components: (1) the evidence must be favorable to the accused, meaning either exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice. *United States v.*

*O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). *Brady* violations implicate a defendant's right to a fair trial. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("*Newsome I*"). "For evidence known to the state at the time of the trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings." *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007).[9] Because a *Brady* violation deprives the accused of his or her constitutional rights, it can form the foundation of a § 1983 claim. *Rodriguez v. Woodall*, No. 03 C 3880, 2004 WL 2583883, at *3 (N.D. Ill. Nov. 12, 2004) (Kennelly, J.) (citations omitted).

ANALYSIS

1. Actions Taken by Devine as First Assistant State's Attorney from 1981 to 1983

Orange's First Amended Complaint states that Devine is sued "in his individual capacity" for "conduct complained of in the course and scope of his employment" as "the State's Attorney of Cook County from 1997 to the present."[10] (1st Am. Compl. ¶ 12.) It is apparent from Orange's responsive briefing, however, that Orange now argues that Devine is liable for conduct undertaken in his capacity as First Assistant State's Attorney, from 1981 to 1983. As Devine correctly notes, parties cannot amend their complaints through arguments made in response to a motion for summary judgment. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). Although Orange has

---

[9] The Seventh Circuit has not weighed in on the question of "whether disclosure of exculpatory evidence discovered *post-trial* is required under Brady." *Steidl*, 494 F.3d at 629 (emphasis added). Because this court grants Devine's summary judgment motion on other grounds, it need not decide the issue; the court assumes that Devine had a general duty to disclose exculpatory evidence to Orange.

[10] Devine took office as the elected State's Attorney for Cook County on December 1, 1996.

signaled his intent to base his claims on Devine's conduct as First Assistant State's Attorney at various stages of this litigation,[11] at no point has Orange explicitly sought leave to expand his claims beyond the scope of the First Amended Complaint.

Orange appears to assume that he has been granted leave to constructively amend his claims against Devine. This assumption is not correct. The court did approve Orange's request for expanded discovery regarding the time period Devine served as First Assistant State's Attorney, but the court's ruling was based on its finding that "[t]he question of whether Devine was ever privy to relevant exculpatory evidence is . . . highly relevant" to Orange's allegation "that Devine's decision *as Cook County State's Attorney* to withhold and suppress exculpatory evidence regarding Orange's allegations of torture . . . contributed to Orange's continued wrongful imprisonment." (7/24/2007 Order at 3, Dkt. No. 431 (emphasis added).) The court did not acknowledge, either explicitly or implicitly, any expansion of Orange's claims to address actions taken by Devine while serving as First Assistant State's Attorney.

For the sake of completeness, the court has analyzed the case as though Orange had explicitly sought leave to amend his complaint to include Devine's conduct as First Assistant State's Attorney. The court notes that it would have rejected a properly filed Rule 15(a) motion for leave to amend, because amendment would be futile. *See Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002) (explaining that leave to amend "is appropriately denied when . . . the amendment would be futile"). Orange's ordeal began when he was arrested on January 12, 1984. Orange has never alleged that Devine or the other alleged co-conspirators had any acquaintance with

---

[11] *See, e.g.*, Plaintiff Orange's Revised Responses to Defendant Devine's First Set of Interrogatories (#7) and Plaintiff Orange's Reply in Support of His Identification of Discovery Needed to Respond to Defendant Devine's Motion for Summary Judgment (¶¶ 19, 21).

Orange prior to his arrest in January 1984. Thus, Devine, who in 1983 ceased being First Assistant State's Attorney, could not have joined a conspiracy "to deprive Plaintiff of his constitutional rights" (1st Am. Compl. ¶ 58) while serving as First Assistant State's Attorney. Nor is it possible for Devine to have withheld exculpatory information from Orange before Orange was arrested or charged in 1984. The chain of inferences necessary to conclude that Orange would not have been tortured in 1984 if Devine had only investigated and prosecuted Area 2 police officers for the torture of Andrew Wilson in 1982 is too tenuous to support Orange's § 1983 claim against Devine. Simply put, even accepting Orange's allegations about Devine's conduct during this time period as true, these allegations do not provide support for Orange's Section 1983 claims against Devine.[12]

2.      Actions Taken by Devine While in Private Practice from 1988 to 1996[13]

It is undisputed that Devine was in private practice during Orange's arrest, torture, trials, conviction, and direct appeal. Generally, "a private citizen cannot [ ] be held liable under Section 1983 because that statute requires action under color of state law." *Brokaw v. Mercer County*, 235

---

[12] Orange argues that, in 1982, Devine joined a conspiracy to suppress "highly exculpatory evidence concerning the criminal nature of the systematic torture practiced at Area 2 by Burge and his men from the Plaintiff and numerous other torture victims [and to] refuse[ ] to investigate or take criminal or administrative action concerning this evidence." (Pl.'s Resp. at 12-13.) Devine cannot be held liable to Orange under Section 1983 for conspiring to violate the constitutional rights of others. *See* 42 U.S.C. § 1983 (stating that violators "shall be liable to the party injured"). Although allegations regarding a "policy or custom" of torture are relevant to Section 1983 claims brought against a municipality, *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978), Orange's *Monell* claim against the City of Chicago was dismissed pursuant to settlement. (5/27/2008 Order at 1-2, Dkt. No. 551.) This court has held that Orange is barred by the Eleventh Amendment from bringing claims against the State's Attorney's Office as a separate entity. (3/30/2005 Order at 27-30, Dkt. No. 71.)

[13] Because, under a liberal reading, the First Amended Complaint could be seen to include allegations that Devine joined a conspiracy to deprive Orange of his constitutional rights as far back as 1988, the court has considered arguments related to Devine's conduct during this time period. (*See* 1st Am. Compl. ¶¶ 46-48.)

F.3d 1000, 1016 (7th Cir. 2000). However, "if a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability." *Id.* (citing *Bowman v. City of Franklin*, 980 F.2d 1104, 1107 (7th Cir. 1992)). "To establish Section 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Id.* (citing *Fries v. Helsper*, 146 F.3d 452 (7th Cir. 1998)). "A conspiracy may be demonstrated by circumstantial evidence." *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1352 (7th Cir. 1985). However, "to sustain a § 1983 action against a private individual, there must be some evidence of some concerted effort or plan between the private party . . . and the state officials." *Id.* at 1352-53. Without evidence of such a plan, Orange cannot prevail on a § 1983 claim against Devine for actions taken while he was in private practice.

As discussed above, there is no evidence suggesting that Devine and his alleged co-conspirators agreed to violate Orange's constitutional rights before they ever met Orange. Orange also admits that there is no evidence in the record of Devine meeting with, or talking by telephone to, any of the Area 2 police officer defendants "wherein they allegedly agreed to falsely imprison, maliciously prosecute, and otherwise deprive Leroy Orange of his Constitutional Rights." (Pl.'s Resp. to Def.'s R. 56.1(a)(3) Stmt. ¶¶ 72, 73.) Although Orange argues that "it is reasonable to infer" from the evidentiary record that Devine "acquired even more knowledge about the systematic torture by Burge and his men, and acted together with them to continue the cover-up" during Devine's time at Phelan, Pope & John (Pl.'s Resp. at 17), Orange does not direct the court to any evidence suggesting that a conspiracy to deprive Orange of his constitutional rights was entered into

while Devine was in private practice.

Ultimately, the court finds there is no evidence in the record suggesting that Devine met with any state actors during the time period of 1988 to December 1, 1996 and planned to deprive Orange of his constitutional rights. Of note, in Orange's description of the evidence, his own name is not mentioned in describing Devine's activities while at Phelan, Pope & John. (*See* Pl.'s Resp. at 8-11.) Nor is there any evidence that Devine had any interactions with state actors concerning Orange during this time period. Although Orange argues that negative inferences can be drawn from the fact that Burge has taken the Fifth Amendment concerning his role in the Area 2 torture conspiracy and his interactions with Devine, this type of inference may be proper only if a co-conspirator or agency relationship has already been established. *See State Farm Mut. Auto. Ins. Co. v. Abrams*, No. 96 C 6365, 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000) (Pallmeyer, J.) ("In order to impute a third-party's Fifth Amendment invocation to another party, the party seeking to use the invocation must establish some relationship of loyalty between the other two parties."). Orange points to no other evidence suggesting that Devine and Burge shared such a relationship and, on its own, "an adverse inference drawn against a party invoking the Fifth Amendment privilege is ordinarily insufficient to support summary judgment in the absence of other independent, material and probative evidence." *Id.* at *5. In this case, the court declines to infer from Burge's silence that a conspiracy to violate Orange's constitutional rights developed while Devine was in private practice. As the Seventh Circuit has noted, "the inference is not required: it may be drawn, but it does not necessarily need to be drawn." *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 317-18 (1976)).

3.  <u>Actions Taken by Devine as State's Attorney from December 1, 1996 to the Present</u>

The court finally reaches Orange's original allegation: that "under the color of his authority of State's Attorney, Defendant Devine has continued, from 1997 [sic] to the present, to protect the interests of [Area 2 police officers] and to cover up their central role in the pattern and practice of torture." (1st Am. Compl. ¶ 49.) Orange alleges that Devine perpetrated this cover-up by discrediting evidence of torture at Area 2, suppressing evidence that further established a pattern of torture at Area 2 (and Area 3), and refusing to investigate allegations of torture at Area 2 (and Area 3). (*Id.*)

As the court previously recognized, a *Brady* violation has three components: (1) the evidence must be favorable to the accused, meaning either exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *O'Hara*, 301 F.3d at 569. *Brady* does not impose on government officials an affirmative duty to search for exculpatory evidence. *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002) ("This court has held many times that *Brady* does not require the government to gather information or conduct an investigation on the defendant's behalf.").

A.  <u>Collateral Estoppel</u>

At the outset, Devine argues that certain issues relevant to the *Brady* analysis have been previously litigated by the Illinois courts, and Orange should be collaterally estopped from relitigating "those issues decided in the prior criminal proceedings." (Def.'s Reply at 11.) Devine's argument centers on the Goldston report and other evidence of a general pattern of abuse at Area 2.

"In determining whether a prior state court judgment bars litigation of a Section 1983 claim,

14

the federal court must apply the state court's preclusion rules." *Stevenson v. City of Chicago*, 638 F. Supp. 136, 138 (N.D. Ill. 1986) (Hart, J.); *see also Sornberger v. City of Knoxville*, 424 F.3d 1006, 1020 n.9 (7th Cir. 2006). In Illinois, collateral estoppel applies when two separate cases arising on different causes of action share a common party, and "some controlling fact or question material to the determination of both causes has been adjudicated against the party in the former suit by a court of competent jurisdiction." *Id.* (quoting *Telegram Savings & Loan Assoc. v. Schilling*, 473 N.E.2d 959, 962 (Ill. 1984)). In other words, "an issue litigated in a prior proceeding may not be relitigated if (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Dunlap v. Nestle USA, Inc.*, 431 F.3d 1015, 1018 (7th Cir. 2005) (citing *Herzog v. Lexington Township*, 657 N.E.2d 926, 929-30 (Ill. 1995)).

In *Orange II*, the court held that Orange's trial counsel was not constitutionally ineffective for "curtail[ing] his investigation" into Orange's allegations of torture, where such investigation was only likely to uncover "generalized allegations of coercive activity in Area 2." *Orange II*, 659 N.E.2d at 941. The court noted that "the trial testimony did not place any of the officers cited in the [Goldston] report at defendant's interrogation," and found there was no reasonable probability that a motion to suppress would have been granted, even if this information had been made available to the court. *Id.* at 940-41. The *Orange II* court did not address the Goldston report and other "generalized allegations of coercive activity in Area 2" in the context of a *Brady* claim, and this court declines to find its holding to be preclusive on the question of whether such evidence should be considered exculpatory or impeaching for purposes of a *Brady* analysis. Furthermore, as

recognized in *Orange III*, the litigation landscape was different at the time of Orange's trial than

years later, when "the nexus between the other cases of alleged abuse and the defendant's case" had

become more firmly established. *Orange III*, 749 N.E.2d at 944 (citing *People v. Mahaffey*, 742

N.E.2d 251 (Ill. 2000)). This court does not find *Orange II* preclusive on the issue of whether

Devine had a duty to disclose the Goldston report and other evidence of systematic torture at Area

2 during the time he served as Cook County State's Attorney.

Orange did raise a *Brady* claim in his second post-conviction petition. In *Orange III*, the

court initially found Orange's *Brady* claim to be procedurally barred because he failed to raise it in

his first post-conviction petition. *Orange III*, 749 N.E.2d at 943. However, the court also went on

to find that Orange was not prejudiced by the prosecution's suppression of evidence supporting a

pattern of torture at Area 2. *Id.* The court noted that the Goldston report was not yet available

during Orange's trial and found that, without this information, "the State did not violate the

*Brady* rule" in failing "to disclose information about misconduct in unrelated cases known only to

individual police officers where the nexus between the other cases of alleged abuse and the

defendant's case was not known until years after the defendant's trial." *Id.* at 944. Because the

Illinois court recognized that Orange's *Brady* claim was procedurally barred, this court finds the

above analysis to be mere dicta, and not a decision on the merits. Furthermore, *Orange III* does not

address the question of whether Devine had a duty to disclose this type of information when he was

serving as State's Attorney, and the "nexus" between Orange's case and others had become

"known."

On a final note, the court addresses Devine's argument that, "because the issue of police

coercion was decided against [Orange] in the criminal trial and he did not raise the issue on appeal,

plaintiff is precluded from raising the issue again in this manner," (Def.'s Reply at 12), and Devine's citation to *Orange II*'s finding that the medical evidence and reports of witnesses "suggest[ ] that no factual basis existed for a motion to suppress." (*Id.* at 13 (citing *Orange II*, 659 N.E.2d at 942).) The court does not agree that "the issue of police coercion" was decided against Orange for purposes of collateral estoppel. In Illinois courts, a prior criminal conviction may be given estoppel effect "in an appropriate case." *Am. Family Mut. Isn. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000). The general elements of collateral estoppel, as outlined above, apply to this analysis. *Id.* Additionally, the *Savickas* court emphasized that "the party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation." *Id.* In this case, because Orange's trial counsel withdrew his motion to suppress, the trial court never had an opportunity to rule on the distinct question of whether Orange's confession was the product of torture. Moreover, the jury did not need to make a finding on the question of torture to find Orange guilty of murder. *Cf. Savickas*, 739 N.E.2d at 451 ("By finding him guilty of first degree murder the jury necessarily found him either to have intended to kill the victim, or at least to have known that his acts created a strong probability of death or great bodily harm. [citation to statute] This finding establishes that he 'intended or expected' the result of his actions, the issue in the declaratory judgment action."). Furthermore, and more important, the question of whether Orange's confession was actually the product of torture was accepted by the court for purposes of this motion. The issue before the court is whether Devine knew about, and failed to turn over, exculpatory or impeaching evidence during the time he served as Cook County State's Attorney. This issue was not addressed in any of the Illinois cases.

B.    Suppression of Favorable Evidence

Although Devine was not personally involved in the litigation of Orange's post-conviction

petitions before the Illinois courts, he may nevertheless have had a duty to disclose exculpatory

evidence to Orange.  *See Houston v. Partee*, 978 F.2d 362, 366 n.3 (7th Cir. 1992).  The court takes

no position on the question of whether absolute prosecutorial immunity bars Orange's *Brady* claim,

recognizing that Devine may not have been acting in his role as a prosecutor at the time he withheld

evidence regarding torture at Area 2.  *Id.* at 366 (the critical question is "whether a prosecutor

*performing a particular function* is entitled to absolute immunity") (emphasis in original).  Instead,

the court looks to the undisputed material facts in determining that Devine cannot be liable for a

*Brady* violation on the record currently before the court.

Evidence is suppressed "if (1) the prosecution failed to disclose the evidence before it was

too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise

available to the defendant through the exercise of reasonable diligence."  *O'Hara*, 301 F.3d at 569.

"The rule requiring prosecutors in criminal proceedings to disclose information is limited to

information known to the prosecution."  *Ienco v. Angarone*, 291 F. Supp. 2d 755, 760 (N.D. Ill.

2003) (Castillo, J.)  In other words, for Devine to be liable on a *Brady* claim, he first had to have

known of and had access to information that was not readily available to Orange through the

exercise of reasonable diligence.  Furthermore, the withholding of information must have prejudiced

the defendant, such that there is "a reasonable probability that the suppressed evidence would have

produced a different verdict."  *O'Hara*, 301 F.3d at 569 (quoting *Strickler v. Greene*, 527 U.S. 263,

281-82 (1999)).  The court finds no evidence in the record that Devine had access to this type of

inside information regarding Orange.

Devine testified at his deposition that he became aware of the Goldston report when he saw media coverage of the report, which was during his time in private practice. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 84; Devine Dep. p. 276, ln. 8-11.) Portions of the Goldston report were unsealed in 1992, and the report received front page coverage in the *Chicago Tribune* at that time. (*See id.*; Ex. AAA.) Devine testified that he did not read the entire report until he was serving as the elected Cook County State's Attorney, which began on December 1, 1996. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 84; Devine Dep. p. 277, ln. 18-23.) By that time, however, Orange already had had access to the Goldston report for over three years, as he submitted the Goldston report "in its entirety to the trial court in support of his first post-conviction petition on February 17, 1993." *Orange III*, 749 N.E.2d at 937. Because Orange had access to the Goldston report by the time Devine became State's Attorney, Devine cannot have acted in his capacity as State's Attorney to suppress the report from Orange.

The evidence before the court suggests that Devine also had access to and knowledge of the Brzeczek letter[14] (and the attached Raba letter) during the time Devine served as First Assistant State's Attorney, and that Devine did not direct the disclosure of this information to Orange after becoming State's Attorney in 1996. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 33.) Like the Goldston report, however, Orange also had access to the Raba letter long before Devine became State's Attorney in late 1996. The Raba letter was tendered to Wilson's attorney sometime prior to September 29, 1982,

_____

[14] In February 1982, Police Superintendent Richard Brzeczek received a letter from Dr. John Raba, who had examined Wilson on February 15 and 16, 1982, detailing Wilson's physical injuries, setting forth Wilson's allegations of torture, and demanding a thorough investigation. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 30; Ex. GG.) Brzeczek wrote to then-State's Attorney Richard M. Daley on February 25, 1982 "seeking [Daley's] direction as to how the Department should proceed in the investigation of these allegations." (*Id.* ¶ 32; Ex. HH.)

and Dr. Raba testified at Wilson's suppression hearing in open court on November 12, 1982. (Def.'s Stmt. of Add'l Facts ¶¶ 1, 4-6, 8.) After Orange had been arrested, in 1984, Orange's trial counsel was contacted by attorneys representing Wilson. *Orange II*, 659 N.E.2d at 940. Orange's trial counsel did not seek more information from Wilson's attorneys at that time, however, "because he found [Orange's] case distinguishable from Wilson's." *Id*. at 940-41. Because Orange could have discovered the Raba letter with the exercise of minimal diligence, Devine cannot be faulted for withholding this information from him. On the other hand, drawing all inferences in favor of Orange, the court recognizes that the Brzeczek letter could be seen as exculpatory evidence, and also that Orange may not have had access to the letter through reasonable diligence.[15] However, as a matter of law, the court finds that no prejudice ensued from any suppression of this information from Orange. Prejudice results if there is "a reasonable probability that the suppressed evidence would have produced a different verdict." *O'Hara*, 301 F.3d at 569 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). This court does not believe the Brzeczek letter, by itself, would have tipped the scales in Orange's favor insofar as convincing the courts of the legitimacy of his own allegations of torture. The Brzeczek letter is specific to the *Wilson* case and thus does not directly support Orange's allegations that he [Orange] was tortured. Additionally, the Brzeczek letter does not directly address the question of whether torture was actually taking place at Area 2, instead hinting generally at a reluctance to investigate allegations of torture in the *Wilson* case. While the Brzeczek letter may have bolstered Orange's credibility to some extent, ultimately the withholding of this information is insufficient to support a *Brady* claim against Devine.

---

[15] It is unclear from the record whether Wilson's attorneys had access to the Brzeczek letter at the time they contacted Orange's trial counsel.

To the extent Orange can show that Devine discussed Wilson's interrogation with then-Assistant State's Attorneys Larry Hyman ("Hyman") and Mike Angarola ("Angarola") during his time as First Assistant State's Attorney from 1981 to 1983, (*see* Pl.'s R. 56.1(b)(3)(C) Stmt. ¶¶ 27-28), there is no evidence that Devine's conversations with Hyman and Angarola presented Devine with inside information suggesting that Wilson had, indeed, been tortured by Area 2 police officers or that there was a pattern of torture at Area 2. Devine testified at his deposition that Angarola did not believe that Wilson had been tortured by Area 2 police officers,[16] (*id.*), and, without other supporting evidence in the record, the court declines to infer from Hyman's taking of the Fifth Amendment that Hyman must have supplied Devine with inside, exculpatory information regarding a pattern of torture at Area 2. *See Abrams*, 2000 WL 574466, at *5.

Other than asserting that Devine had a general awareness of allegations of torture at Area 2, (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 73), Orange does not set forth any other evidence of exculpatory information to which Devine is alleged to have had special access—either during his time as First Assistant State's Attorney, during private practice at Phelan, Pope & John, or while serving as Cook County State's Attorney.

C.    Absolute Prosecutorial Immunity

Finally, the court notes that all other allegations involving Devine's actions or omissions as State's Attorney are barred by the doctrine of absolute prosecutorial immunity. Absolute prosecutorial immunity protects prosecutors from liability "for their conduct in initiating a prosecution and in presenting the State's case, insofar as that conduct is intimately associated with

---

[16] Angarola is now deceased. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 25.)

the judicial phase of the criminal process." *Houston*, 978 F.2d at 365 (internal quotations and citations omitted). This may include actions "preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976). For absolute immunity to attach, defendant prosecutors must have been acting "as prosecutors" (*i.e.* in their "role as advocate for the State") at the time of the complained of conduct. *Houston*, 978 F.2d at 366.

Devine's decisions not to prosecute Burge or other Area 2 police officers, not to investigate further into allegations of torture at Area 2, not to seek a reduced sentence for Orange, and to oppose Orange's petition for clemency and pardon are all decisions that were clearly made in Devine's role as lead advocate for Cook County, after discussion with his advisors. These decisions cannot form the basis of liability for Orange's § 1983 claim.

D.    *Brady* Conclusion

For the reasons articulated above, the court finds there are no disputed material facts regarding Devine's actions as Cook County State's Attorney that suggest Devine should be found liable for depriving Orange of his right to a fair trial under § 1983. Summary judgment is therefore granted in Devine's favor on Count 1 of Orange's First Amended Complaint.

4.    State Law Claims

Orange's remaining claims against Devine are brought under state law for false imprisonment (Count VII), malicious prosecution (Count VIII), intentional infliction of emotional distress (Count IX), and conspiracy (Count X). When all claims based on federal law have been denied, the court is usually in a position to dismiss the remaining state law claims without prejudice, pursuant to its discretionary authority to relinquish supplemental jurisdiction. *Williams v.*

*Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). However, the court should refrain from doing so if the statute of limitations would bar refiling of the claims in state court, as in this case. *See id.*

Devine argues that this court lacks jurisdiction over the remaining state law claims, because the Illinois Court of Claims (as opposed to the circuit courts) has exclusive jurisdiction over "[a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit." 705 ILCS 505/8(d) (West 2004). In its March 30, 2005 order denying the County Defendants' motion to dismiss, this court recognized its jurisdiction to entertain causes of action against a state official who is alleged to have acted in violation of statutory or constitutional law, or in excess of his authority. (3/30/2005 Order at 30-31, Dkt. No. 71.) The court found that the allegations against Devine "relate to actions clearly outside [his] authority as state's attorney[ ]." (*Id.* at 31.) This court stands by its earlier holding, finding that supplemental jurisdiction over Orange's state law claims was proper at the outset of this case and remains appropriate at this stage of the litigation.

Ultimately, however, the court agrees with Devine's alternative assertion that the core facts necessary to support Orange's state law claims are lacking. On the evidentiary record, as analyzed above, this court finds no disputed questions of material fact that preclude entry of summary judgment in favor of Devine on Orange's state law claims. Orange has failed to direct the court to any evidence that Devine acted unlawfully or with the purpose of injuring Orange. Accordingly, the court grants summary judgment in favor of Devine on all of Orange's remaining state law claims.

<u>CONCLUSION</u>

For the reasons stated above, Devine's Second Amended Motion for Summary Judgment (Dkt. No. 481) is granted. All remaining claims against defendant Devine are dismissed with prejudice.

ENTER:

_James F. Holderman_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: September 25, 2008