IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LEROY ORANGE,                          )
                                       )
                  Plaintiff,           )
                                       )
        v.                             )        No. 04 C 0168
                                       )
JON BURGE, et al.,                     )
                                       )
                  Defendants.          )


MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On January 10, 2003, plaintiff Leroy Orange ("Orange") was pardoned by then-Governor

George H. Ryan, after serving nineteen years on death row for a crime Orange says he did not

commit. Orange promptly filed a civil rights lawsuit against numerous defendants, including former

Assistant Cook County State's Attorney Dennis Dernbach ("Dernbach"). Orange claims that

Dernbach is liable under 42 U.S.C. § 1983 for depriving Orange of his right to a fair trial and for

Orange's wrongful conviction (Count I) and for engaging in coercive interrogation (Count IV).

Orange also claims under state law that Dernbach is responsible for false imprisonment (Count VII),

malicious prosecution (Count VIII), intentional infliction of emotional distress (Count IX), and

conspiracy (Count X).[1] Dernbach's Second Amended Motion for Summary Judgment (Dkt. No.

---

[1] Orange's § 1983 claim for false arrest/false imprisonment (Count II) and his § 1983
claim for torture and physical abuse (Count III) were dismissed on statute of limitations grounds.
(8/11/2006 Order at 11, Dkt. No. 241.) Orange's § 1983 claim for deprivation of access to the
courts (Count V) was dismissed for failure to state a claim upon which relief may be granted.
(3/30/2005 Order at 17, 34, Dkt. No. 71.)

485) is now before the court. For the reasons set forth in the analysis that follows, Dernbach's motion is granted in part and denied in part. Count VII is dismissed with prejudice. All other claims against defendant Dernbach remain pending.

## BACKGROUND

The court's sole function in addressing a motion for summary judgment is to determine whether there is a genuine issue of fact that requires trial. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). In the Northern District of Illinois, Local Rule 56.1 guides the parties through the summary judgment process, outlining the procedures for setting facts before the court in the manner most helpful to the court's determination of whether there is a factual dispute for trial. *See Brown v. GES Exposition Serv., Inc.,* 03 C 3921, 2006 WL 861174, at *1 (N.D. Ill. Mar. 31, 2006) (Lefkow, J.) ("The purpose of Local Rule 56.1 is to isolate legitimately disputed facts and assist the court in its summary judgment determination."). Through "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence," Local Rule 56.1 distills the evidence uncovered during discovery into its essential components. *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 527 (7th Cir. 2000).

In briefing a motion for summary judgment, both the moving party and the nonmoving party are afforded an opportunity to set the evidentiary record before the court. Specifically, Local Rule 56.1(b)(3)(C) permits the nonmoving party to submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." N.D. Ill. R. 56.1(b)(3)(C). The burden then shifts to the movant to rebut all properly submitted additional facts; failure to respond to the additional facts results in their admission:

"If additional material facts are submitted by the opposing party pursuant to section (b), the moving party may submit a concise reply in the form prescribed in that section for a response. All material facts set forth in the statement filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party."

N.D. Ill. R. 56.1(a). The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004).

In this case, Orange filed a 56.1(b)(3)(C) statement after first seeking permission from the court to exceed the usual forty-paragraph allotment. (Dkt. No. 507.) Without any explanation or excuse, Dernbach has filed no response to Orange's 114 paragraphs of asserted facts. The court finds that the proper exercise of its discretion dictates that Orange's 56.1(b)(3)(C) additional facts must be deemed admitted for purposes of Dernbach's summary judgment motion. The court therefore recites these facts as set forth in Orange's 56.1(b)(3)(C) statement, including any relevant undisputed facts set forth in Dernbach's Local Rule 56.1(a)(3) statement, as well.

General Background

On January 11, 1984, four individuals were murdered at an apartment in Chicago. (Def.'s R. 56.1(a)(3) Stmt. ¶ 5.) Chicago Police detectives investigating the murders learned that Orange had been in the apartment with the victims on the night in question. (*Id.* ¶ 6.) On the afternoon of January 12, 1984, Orange was arrested on an unrelated misdemeanor warrant and transported to Area 2 Police Headquarters ("Area 2") for questioning about the murders. (*Id.*; Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 25.) Orange's half brother, Leonard Kidd ("Kidd"), was also brought to Area 2 on January 12, 1984, for questioning about the murders. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 95.)

At the time of Orange's arrest, Dernbach was working as an Assistant State's Attorney ("ASA") in the Cook County State's Attorney Office, serving as Deputy Supervisor of the Felony Review Unit. (Def.'s R. 56.1(a)(3) Stmt. ¶ 3.) Felony Review Assistants work twenty-four hours a day with the various police Areas, assisting the police in various investigations. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 2.) On January 12-13, 1984, Dernbach's job was to go to Area 2 when called by the police, review the evidence in the case, take a statement from Orange (if Orange was willing to give one), and determine what charge, if any, should be brought against Orange based on the evidence. (Def.'s R. 56.1(a)(3) Stmt. ¶ 18.)[2]

The Interrogation

Orange arrived at Area 2 around 3:20 p.m. on the afternoon of January 12, 1984. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 26.) Orange was placed in an interrogation room and confronted with allegations about the murders by two white male detectives. (*Id.* ¶ 26.) Orange responded with denials and disbelief. (*Id.* ¶ 26.) The next thing Orange remembers is somebody sticking his hand inside the door, flicking the light switch off, roughing him up, and putting a bag over his head. (*Id.* ¶ 27.) There were two or three detectives involved in this incident, and they said "you are going to tell us where the f-ing knife is, nigger," and "you are going to talk." (*Id.* ¶ 28.) Orange thinks that the bag may have been over his head for 45 seconds to a minute, and he tried to bite through it. (*Id.* ¶ 29.) Eventually, the detectives who had bagged Orange left the room, and the first detectives

---

[2] Dernbach cites to page 636 of his 8/17/2006 deposition in support of this statement. Def.'s R. 56.1(a)(3) Stmt. ¶ 18. The court cannot ascertain whether Dernbach's description is supported by the record, because page 636 is not included in the materials filed with the court. (*See* Dkt. No. 491.) However, the court notes that Orange has not denied this general description of Dernbach's duties, instead focusing on Dernbach's role in the investigation of Orange as it actually took place on January 12-13, 1984. (Pl.'s Resp. to Def.'s Rule 56.1(a)(3) Stmt. ¶ 18.)

returned, turned on the light, and resumed the interrogation. (*Id.* ¶ 30.)

When Orange continued "not to have the right answers," one of the detectives said "I thought you were ready to cooperate." (*Id.*) Orange then told these detectives about the bagging. (*Id.* ¶ 31.) At the time, the detectives were going in and out of the room, talking to others outside the door. (*Id.*) Orange was then bagged again, this time with the lights on. (*Id.* ¶ 33.) He held his breath and was punched between his chest and stomach. (*Id.*) Orange believes that commanding Lieutenant Jon Burge ("Burge") was going in and out of the room during the second bagging, or being consulted outside the door by the other detectives. (*Id.*) Dennis McGuire ("McGuire") was the lead detective on the murder investigation. (*Id.* ¶ 32.) Robert Flood ("Flood") and Leonard Bajenski ("Bajenski") were main participants in the investigation and interrogation of both Orange and Kidd. (*Id.*)

When the interrogation was again resumed, Orange continued to say "I don't know what you're talking about." (*Id.* ¶ 34.) There may have been a third bagging, which was interrupted by someone outside the room. (*Id.* ¶ 35.) People were walking in and out during the bagging incidents. (*Id.*)

Orange was then taken to a nearby interrogation room where Kidd was being held. (*Id.* ¶ 36.) Kidd looked beaten and bruised and like he had been crying. (*Id.*) Upon seeing Kidd's condition, Orange told him "just tell them I did it and they'll leave you alone." (*Id.*)

Orange returned to the initial interrogation room. (*Id.* ¶ 37.) The detectives said "so tell me what happened," and Orange responded "you want somebody said he done it, okay, I done it, [but] I don't have a story for you." (*Id.*) Orange said this so that they would quit doing what they were doing to Kidd and what they were doing to Orange. (*Id.*) The interrogators insisted that if Orange

had committed the crimes, he should take them to the weapons, but Orange was unable to do that, and he kept saying over and over that he did not know where the weapons were. (*Id.* ¶ 38.) Orange was called "a few more niggers" throughout the evening. (*Id.* ¶ 39.)

At about 9:30 p.m., Burge called Dernbach at his home and summoned him to Area 2. (*Id.* ¶ 40.) Dernbach arrived at Area 2 about 10:30 p.m. and had a conversation about the case with Burge, outside Burge's office in the general detectives' work area. (*Id.* ¶ 41.) Burge informed Dernbach of what had occurred up to the present time, what the status of the case was, and that the detectives "had not completed their investigation yet." (*Id.*)

From approximately 11:00 p.m. to 12:30 a.m., Dernbach had conversations with detectives McGuire, Flood, Bajenski, and others concerning the status of the investigation, either in the general detective work area, just outside one of the interview rooms, or in one of those rooms. (*Id.* ¶ 45.) The detectives showed Dernbach photographs of the victims, and a photograph of a large kitchen knife. (*Id.*) While Dernbach was engaged in this conversation, he saw Orange brought back into Area 2 from a trip to search at his mother's house for a sweater, and placed in a nearby interrogation room which opened into or faced the detective work area. (*Id.* ¶¶ 47-48.)

The detectives proceeded to "go back and forth" "telling [Orange] the story" all night long. (*Id.* ¶ 49.) They fed Orange the story they wanted him to tell and the chronological order, and if he got it wrong they would say "no, no, no, it don't go like that. It go like this." (*Id.*) Sometimes they said the information came from Kidd, on other occasions it came from the detectives. (*Id.* ¶ 50.) This feeding of the story to Orange went on all night. (*Id.*) A state's attorney was also doing the same thing as the detectives, showing photographs and saying "it went like this, it went like that." (*Id.* ¶ 51.) Orange had been alternatively saying that he did the murders, and that he didn't know

anything about them. (*Id.* ¶ 56.) In fact, Orange did not know what happened at the apartment but had agreed to say he "did it" under torture. (*Id.*)

Either late at night or early the next morning, about an hour before Orange gave his court-reported statement, and after he had been taken to his mother's house to obtain his clothing, the electric shocking began. (*Id.* ¶ 53.) Orange's inability to take the detectives to the weapons and his resistance to getting "the story straight" got the detectives agitated and led to the electric shocking. (*Id.* ¶ 54.) At this point, Burge, a big redhead, came into the interrogation room, swearing and cursing, accusing Orange of "BSing." (*Id.* ¶ 55.) Burge began to supervise things. (*Id.*) Burge was threatening Orange, assuring him that he would cooperate, "talking stuff," nodding his head as the electric shock was going on. (*Id.*) The electric shocking began with a shiny object being rubbed across Orange's handcuffed and outstretched arm, with Burge standing in front of him and four others in the room. (*Id.* ¶ 57.) Orange felt an extremely painful shock on his arm and hand. (*Id.*) Burge was constantly threatening him and called him "nigger" a few times. (*Id.* ¶ 58.) Orange's pants were then pulled down, and he felt something sharp, then three or four shocks to his buttocks. (*Id.* ¶ 59.) During the shocking, Orange was in full view of the interrogation room door, but he does not know if it was open or closed. (*Id.* ¶ 60.) Orange was being held around the neck and body, was struggling to stop the shocking, and tried to wiggle away. (*Id.* ¶ 61.) While he was struggling, Orange briefly saw a dark box and wires with a generator or transformer in it near the desk on the floor in the interrogation room. (*Id.*) Orange was next shocked on the back of his scrotum, and he felt excruciating pain. (*Id.* ¶ 62.) Directly after that, Orange felt somebody try to "stick something in my butt," but they could not because he wiggled or they missed. (*Id.* ¶ 63.) Burge and his men then lubricated Orange's anus, they got the shocking device "inside his butt" and electric shocked

him, causing excruciating pain, and affecting his bowel muscles for months afterward. (*Id.*) Orange screamed out during this electric shock torture. (*Id.* ¶ 64.) After the electric shock ended, Orange pulled up his pants and felt like he had been raped. (*Id.*)

The detectives then filed out of the room, but one or two returned and began to again go through photographs and preparation of the story. (*Id.* ¶ 68.) Orange felt more passive and defeated. (*Id.*) A state's attorney to whom Orange had talked off and on throughout the night then entered the room. (*Id.* ¶ 69.) Orange tried to tell the state's attorney what had happened to him, and the state's attorney said "Bullshit, just as I thought," and walked out of the room. (*Id.*) Orange felt this was his last cry for help and lost hope. (*Id.* ¶ 70.) Detective Bajenski was sitting in the corner of the room when this exchange between Orange and the state's attorney took place. (*Id.* ¶ 71.) After the state's attorney left, Bajenski grabbed Orange by the testicles and said "we can go through this again all night if you want to." (*Id.* ¶ 73.)

Less than half an hour later, with Bajenski still in the room, a state's attorney who looked similar to the one who had said "Bullshit" and walked out—white, heavy, and wearing a blazer—entered the room. (*Id.* ¶¶ 74-75.) Burge also came into the room and said about the state's attorney, "I know how this guy works. Just go along with him [and] everything is going to be fine." (*Id.* ¶ 76.) The state's attorney first went over some written questions or notes that he had and the pictures again with Orange, then left the room and returned with a court reporter. (*Id.* ¶ 78.) The state's attorney then took Orange's court-reported statement. (*Id.*)

The court-reported statement on its face identifies the state's attorney who took Orange's statement as Dernbach. (*Id.* ¶ 79.) About the same time that Orange recalls telling a state's attorney about his mistreatment, at approximately 1:30-2:00 a.m., records show that Dernbach, Flood, and

Bajenski were allegedly taking an oral statement from Orange. (*Id.* ¶ 72.) Dernbach admits there was no other state's attorney involved in the questioning of Orange or Kidd, and he did not see any other state's attorney at Area 2 during the time Orange and Kidd were in custody. (*Id.* ¶ 52.) The documentation identifies only one other ASA who was present at a lineup at 11:30 a.m. on January 13, 1984, many hours after Orange's court-reported statement was complete and Dernbach had left Area 2. (*Id.*)

Dernbach—recognized by Orange as the state's attorney who took his statement—was present from time to time earlier in the evening when Orange was questioned by the detectives, and was in and out, with photographs and asking questions. (*Id.* ¶ 81; Orange 7/26/2006 Dep. at 457:8-19.) When Dernbach came in with his questions earlier in the evening, if Orange could not get the story right, Dernbach would leave, the detectives would come back, and Orange "would have more problems out of them." (*Id.* ¶ 82.) During the evening and early morning hours, the detectives would come in and give Orange a version of what happened. (*Id.* ¶ 83.) Dernbach would then come in, and any time Orange had anything out of sequence, or wrong, he would be corrected and Dernbach would say "no, you did this first or that first." (*Id.*) Orange believes that Dernbach came in at least four times before Dernbach took the court-reported statement. (*Id.* ¶ 84.) For the thirteen hours that Orange was under interrogation and repeatedly tortured and abused, Orange did not sleep or receive any food or drink. (*Id.* ¶ 85.) According to McGuire, the main interrogator, Orange gave no statement from the time he gave a brief, unrecorded admission at 6:00 p.m. on January 12, 1984, until he gave an oral statement to Dernbach at 1:30 a.m. on January 13, 1984, in the presence of Flood and Bajenski. (*Id.* ¶ 89.) During both the oral statement and the court-reported statement, Dernbach has testified that he found Orange to be alert and articulate, showing no signs of physical

injury or impairment. (Def.'s R. 56.1(a)(3) Stmt. ¶¶ 24, 35.)

The Court-Reported Statement

Orange's court-reported statement commenced at 3:56 a.m. on January 13, 1984, with Orange, Dernbach, Bajenski, and the court reporter in the room. (*Id.* ¶¶ 78, 80.) Dernbach admits that his questioning of Orange was based on information he had obtained from Burge, the other detectives, and from Kidd, and that he asked leading questions in the court-reported statement he took from Orange. (*Id.* ¶ 86.) Dernbach and the detectives wanted Orange to give a specific order of how the victims were tied up and killed, and created it for him on paper in his court-reported statement. (*Id.* ¶ 87.) In his court-reported statement, Orange basically only had to say "yes or no." (*Id.* ¶ 56.) Dernbach admits that Orange's court-reported statement was not believable, and that Dernbach made no effort to clear up what appeared to him to be an unbelievable confession. (*Id.* ¶ 90.) Dernbach did not have any scientific evidence whatsoever that linked Orange to the crimes. (*Id.* ¶ 91.) Dernbach admits that he did not talk to Orange outside the presence of the Area 2 detectives who were involved in interrogating Orange, and Dernbach further admits that, although he knew that Bajenski had been involved in the questioning of Orange and Kidd previously, he did not ask Bajenski to leave the room when he asked Orange if he had been mistreated. (*Id.* ¶ 93.) Dernbach admits that if he were taking Orange's statement today, he would have asked Bajenski to leave so he could ask Orange how he had been treated without the detective present. (*Id.* ¶ 94.) Dernbach asked Orange how he had been treated by the police, and Orange said he had been treated well. (Def.'s R. 56.1(a)(3) Stmt. ¶ 25.) Orange did not tell Dernbach at the time of the oral or court-reported statement that he had been abused or mistreated. (*Id.*)

10

Orange's Criminal Case

Pursuant to his responsibility as an ASA, Dernbach approved murder charges against Orange and Kidd on January 13, 1984. (Def.'s R. 56.1(a)(3) Stmt. ¶ 8.) Although Orange did not file a motion to suppress his oral or written confessions to the murders, he did testify at his criminal trial that he did not commit the murders and that the police abused and coerced him into admitting the murders prior to being charged. (*Id.* ¶ 9.) Dernbach testified at Orange's criminal trial for purposes of introducing the court-reported statement he had taken from Orange on January 13, 1984 into evidence. (*Id.* ¶ 21; Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 114.) In his testimony, Dernbach did not reveal his actual knowledge about the circumstances of Orange's interrogation or his knowledge about the methods used to obtain the court-reported statement. (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶ 114.)

On May 24, 1985, Orange was convicted of multiple charges related to the four murders and sentenced to death. (Def.'s R. 56.1(a)(3) Stmt. ¶ 10.) Orange's convictions for murder and concealment of a homicidal death, as well as his sentence, were affirmed on appeal. (*Id.* ¶ 11.) Orange filed a post-conviction petition arguing, *inter alia*, that he was the victim of torture at Area 2. (*Id.* ¶ 12.) The trial court dismissed Orange's post-conviction petition. (*Id.* ¶ 13.) The Supreme Court of Illinois held that Orange's trial counsel was not constitutionally ineffective for failing to investigate Orange's allegations of torture and, in the alternative, that Orange was not prejudiced because the evidence before the court did not corroborate Orange's allegations of torture. (*Id.*; *People v. Orange*, 659 N.E.2d 935 (Ill. 1995) ("*Orange II*").) The court remanded the petition for purposes of determining whether Orange received ineffective assistance of counsel during his capital sentencing hearing. (*Id.* ¶ 14.) Before the proceedings in the trial court were concluded, then-

Governor Ryan pardoned Orange on January 10, 2003.[3]  (*Id.* ¶ 17.)

Dernbach's Knowledge Regarding Other Allegations of Torture

At the same time Orange was being interrogated at Area 2, Orange's half brother Kidd was in a different interrogation room at Area 2, also being interrogated.  (Pl.'s R. 56.1(b)(3)(C) Stmt. ¶¶ 95-96.)  Kidd was bagged, electric shocked, and repeatedly hit on the back of the head.  (*Id.* ¶¶ 97-98, 100, 103.)  Twice, Kidd's head hit the table, resulting in an open cut on his head that bled on the table and caused swelling.  (*Id.* ¶ 100.)  Burge, Bajenski, and other detectives kept telling Kidd that he was "going to tell them what they want to know about the murders," called Kidd "niggers" and threatened to "kill his black ass."  (*Id.* ¶¶ 99, 101.)  When the state's attorney came in the room, Kidd told him that the detectives "had been kicking his ass."  (*Id.* ¶ 107.)  The state's attorney said "he ain't ready" and walked out.  (*Id.*)  The detectives then came back in, threatened to kill Kidd, and asked if he wanted to go through what he had gone through before, and Kidd said no.  (*Id.*)  At about 10:30 p.m., Kidd gave a detailed oral statement to Flood and McGuire in the Area 2 interview room in which he was being held.  (*Id.* ¶ 108.)  Kidd gave a court-reported statement to Dernbach in the presence of Bajenski at 2:50 a.m.  (*Id.* ¶ 110.)  Dernbach admits that he talked to Kidd, saw a wound on his head, and asked Kidd about it.  (*Id.* ¶ 109.)  The state's attorney who said that Kidd was not "ready" was the same state's attorney who took Kidd's statement—Dernbach.  (*Id.* ¶ 111.)  Dernbach admits that Kidd's statement was not believable.  (*Id.* ¶ 112.)

Dernbach was also aware of various allegations regarding electric shocking, bagging, and other torture at Area 2, beginning in 1982 and continuing throughout 1983.  (Pl.'s R. 56.1(b)(3)(C)

---

[3] Orange also filed a second post-conviction petition, which was denied by the trial court on September 29, 1998.  (Def. 15.)  The Supreme Court of Illinois affirmed this ruling on April 19, 2001.  (*Id.*; *People v. Orange*, 749 N.E.2d 932 (Ill. 2001) ("*Orange III*").)

Stmt. ¶¶ 7-8, 11, 17.)  From 1982 onward, torture by electric shock and baggings was an "open secret" at Area 2, and Burge had a reputation for torture and abuse.  (*Id.* ¶ 15.)  Despite this knowledge, Dernbach saw no need to question the detectives about their treatment of Orange in January 1984.  (*Id.* ¶ 43.)

## LEGAL STANDARDS

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Once a motion for summary judgment has been filed, the burden shifts to the nonmovant to "show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial."  *Warsco v. Preferred Technical Group*, 258 F.3d 557, 563 (7th Cir. 2001).  "The nonmoving party must show that there is evidence upon which a jury reasonably could find for him; that requirement is not met by producing only a 'mere scintilla' of evidence."  *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  When ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor.  *Omega Health. Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007).  The court is not to make credibility determinations or weigh conflicting evidence when ruling on a motion for summary judgment. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).  Summary judgment will be granted in favor of the moving party if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

To prevail on a § 1983 claim, a plaintiff must prove that the defendant (1) deprived the plaintiff of his or her federal constitutional right; and (2) acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Jenkins v. Keating*, 147 F.3d 577 (7th Cir. 1998) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (emphasis in original)).

<u>ANALYSIS</u>

1.    <u>Collateral Estoppel / Res Judicata</u>

Dernbach argues that Orange should be collaterally estopped from relitigating "the facts established and the issues decided in the criminal proceeding." (Def.'s Mem. at 9 (quoting *Talarico v. Dunlap*, 685 N.E.2d 325, 328-29 (Ill. 1997).) Specifically, Dernbach contends that the issues of (1) "police coercion," (2) "[Orange's] contention that certain pattern and practice evidence proves his claim," and (3) whether Orange "mention[ed] the alleged torture to Dernbach" have all been previously decided by the Illinois courts. (Def.'s Mem. at 9, 11-12.) This court does not agree that collateral estoppel bars Orange from raising these issues in the current lawsuit.

"In determining whether a prior state court judgment bars litigation of a Section 1983 claim, the federal court must apply the state court's preclusion rules." *Stevenson v. City of Chicago*, 638 F. Supp. 136, 138 (N.D. Ill. 1986) (Hart, J.); see also *Sornberger v. City of Knoxville*, 424 F.3d 1006, 1020 n.9 (7th Cir. 2006). In Illinois, "an issue litigated in a prior proceeding may not be relitigated if (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party

14

against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Dunlap v. Nestle USA, Inc.*, 431 F.3d 1015, 1018 (7th Cir. 2005) (citing *Herzog v. Lexington Township*, 657 N.E.2d 926, 929-30 (Ill. 1995)).

For reasons set forth more fully in the court's September 25, 2008 Memorandum Opinion and Order, the court does not agree that "the issue of police coercion" was decided against Orange for purposes of collateral estoppel. (*See* 9/25/2008 Order at 14-17, Dkt. No. 561.) At Orange's criminal trial, neither the court nor the jury was specifically required to determine whether coercive techniques were used to procure a confession from Orange, and no "decision on the issue [was] necessary to the judgment in the first litigation." *Am. Family Mut. Isn. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000).

Dernbach also argues that the Supreme Court of Illinois has roundly rejected Orange's "contention that certain pattern and practice evidence proves his claim." (Def.'s Mem. at 11.) Again, this court disagrees. In *Orange II*, the court addressed certain evidence of a pattern of torture at Area 2 in the context of Orange's ineffective assistance of counsel claim. Ultimately, the court determined that Orange was not prejudiced by his trial counsel's failure to investigate evidence of a pattern of torture at Area 2 or his counsel's failure to file an amended motion to suppress Orange's confession, because "the record in this case suggests that no factual basis existed for a motion to suppress." *Orange II* can be distinguished from the current litigation in a number of ways. First, *Orange II* involved questions regarding the use of "pattern" evidence solely in support of a motion to suppress Orange's confession. The *Orange II* court had no occasion to rule on the question of whether such evidence is relevant to, or persuasive in supporting, a § 1983 civil rights claim, including a *Brady* claim. Second, at the time he filed his first post-conviction petition, Orange had

not identified any of the individual police officers involved in his interrogation, and the *Orange II* court noted that "the trial testimony did not place any of the officers cited in the [Goldston] report at defendant's interrogation." *Orange II*, 659 N.E.2d at 940. In this litigation, by contrast, Orange has identified Burge as an officer directly involved in his interrogation and alleged torture. Furthermore, as noted in this court's September 25, 2008 Memorandum Opinion and Order, the litigation landscape has changed since *Orange II*, such that "pattern" evidence of torture at Area 2 has been bolstered by numerous reports and findings indicating that such evidence may be relevant to allegations of torture in an individual case. (*See* 9/25/2008 Order at 15-16.) Finally, this court notes that a ruling on the question of prejudice was not necessary to the *Orange II* court's holding, as the court also determined that the performance of Orange's trial counsel did not fall below an objective standard of reasonableness. *Cf. Savickas*, 739 N.E.2d at 451 ("[T]he party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation.") This court finds it premature to rule at this point in the litigation on the admissibility of "pattern" evidence as a general matter, as such a ruling will depend on the purpose for which such evidence is introduced. At the same time, however, the court rejects Dernbach's argument that the Illinois courts have determined that this evidence cannot be considered for any purpose.

*Orange III* recognized that "[b]ecause a proceeding brought under the [Post-Conviction Hearing] Act is a collateral attack on a judgment of conviction, all issues actually decided on direct appeal are *res judicata*, and all issues that could have been raised in the original proceeding but were not are waived." *Orange III*, 749 N.E.2d at 938. The court found that, in arguing that "pattern and practice evidence would corroborate his claim of mistreatment at Area 2," Orange was raising

"essentially the same claim that the defendant raised in his first post-conviction petition several years earlier" and, in the alternative, "that the argument is one that could have been raised in the earlier proceeding." *Orange III*, 749 N.E.2d at 940. The court therefore held that Orange's second post-conviction petition was procedurally barred.

Although this ruling was not on the merits, the *Orange III* court also noted that "[a] ruling on an initial post-conviction petition has *res judicata* effect with respect to all claims that were raised *or could have been raised* on the initial petition." *Orange III*, 749 N.E.2d at 939 (emphasis added). At this point in Orange's litigation, this court declines to find preclusive effect in the arguments that could have been raised (but were not) in Orange's first post-conviction petition. Collateral estoppel is an equitable doctrine, and the equities in this case require that the question of Orange's alleged torture be fully and fairly litigated on the merits. No court has yet held an evidentiary hearing on this question, nor has any court had the opportunity to consider all of the deposition and documentary evidence that has been developed through the discovery process in the case now before this court. *See Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006); *People v. Cannon*, 688 N.E.2d 693, 696-97 (Ill. App. Ct. 1st Dist. 1997); *Cf. Orange II*, 659 N.E.2d at 941 (at the time of Orange's first post-conviction petition, Orange presented only "generalized allegations of coercive activity in Area 2, without other evidence"). Orange's claim regarding his allegedly tortured confession is now ripe for a final adjudication on the merits, and will not be dismissed on the grounds of collateral estoppel.

Finally, Dernbach points out that Orange "testified under oath in the underlying criminal matter that when he talked with former ASA Dernbach at the time of his confession, he did not mention the alleged torture to Dernbach." (Def.'s Mem. at 12.) At his trial, Orange testified as

follows:

> Q. Now, let's go back to when you were in the police station and the matters that you testified previously to were occurring. Did you speak to the State's Attorney before you gave him this statement?
>
> A. When I was at the police station?
>
> Q. Yes.
>
> A. Yes.
>
> Q. Now, did he identify himself as a member of the State's Attorney's Office?
>
> A. Yes.
>
> Q. Did you at that time say anything to him about what had occurred earlier in the police station?
>
> A. No.
>
> Q. You recognized that he was from the Prosecutor's Office, did you?
>
> A. No.
>
> Q. He told you he was, though, didn't he?
>
> A. So had someone else. And when I went to tell them what happened, he said, "That's B.S.," and walked out the room, and they started again.

(Def.'s R. 56.1(a)(3) Stmt. ¶ 30; Orange Trial Tr. at 1132-33.) In light of the undisputed facts as set forth above, it is apparent that Orange understood the reference to "at that time" to mean during the time Orange gave his oral statement to Dernbach. Orange has never claimed that he told Dernbach he was being tortured when he gave his oral statement; thus, the above-quoted trial testimony does not directly refute any of the evidence upon which Orange now relies to support his claims against Dernbach. Furthermore, although Orange's trial testimony does suggest that Orange believed Dernbach was not the state's attorney to whom Orange made the statement that he was being

tortured—that this was "someone else"—the court finds that on the fully-developed record there is

a disputed question of fact as to whether there was actually a second state's attorney at Area 2 on

the evening of January 12-13, 1984, or if, instead, Dernbach was the person whom Orange notified

about "what happened."  (*See* Pl.'s Resp. to Def.'s R. 56.1(a)(3) Stmt. ¶¶ 25, 29.)

2.    Absolute Prosecutorial Immunity

Dernbach also argues that all of Orange's claims against him are barred by the doctrine of

absolute prosecutorial immunity.  Absolute prosecutorial immunity protects prosecutors from

liability "for their conduct in initiating a prosecution and in presenting the State's case, insofar as

that conduct is intimately associated with the judicial phase of the criminal process."  *Houston v.

Partee*, 978 F.2d 362, 366 n.3 (7th Cir. 1992) (internal quotations and citations omitted).  This

includes actions "preliminary to the initiation of a prosecution and actions apart from the

courtroom," *Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976), in addition to "the professional

evaluation of the evidence assembled by the police and appropriate preparation for its presentation

at trial or before a grand jury." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  However, for

absolute immunity to attach, defendant prosecutors must have been acting "as prosecutors" (i.e. in

their "role as advocate for the State") at the time of the complained of conduct.  *Houston*, 978 F.2d

at 366.  Prosecutors who are not acting as advocates, but are instead involved in "the preliminary

investigation of an unsolved crime" are protected only by qualified immunity.  *Buckley*, 509 U.S.

at 275.  "When the functions of prosecutors and detectives are the same, as they were here, the

immunity that protects them is also the same." *Id.* at 276.

In this case, the undisputed material facts demonstrate that Dernbach was personally

involved in Orange's ongoing interrogation, and that he coached Orange regarding the false

confession Orange was to deliver in exchange for the cessation of the alleged torture sessions. This type of behavior distinguishes Dernbach from a prosecutor who "simply evaluated the evidence assembled." *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997). Instead, Dernbach actively assisted in gathering the evidence that would later form the basis of the charges against Orange. Dernbach was present during the electric shocking and Orange's ongoing attempts to get "the story" straight. *Cf. Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991) ("[ASA] Petrocelli was not present when Hunt claims he was beaten; and Petrocelli was not present at the particular time Hunt alleges he gave his coerced confession. . . . Hunt's initial contact with Petrocelli came when Petrocelli was called after Hunt had confessed and the police were seeking review of and approval or disapproval of the charges they were detaining him on."). The Supreme Court has recognized that "a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime . . . remains protected only by qualified immunity." *Buckley*, 509 U.S. at 275. Because Dernbach was acting in an investigatory capacity in relation to Orange, Dernbach's actions are not protected by absolute prosecutorial immunity under either federal or state law. *See White v. City of Chicago*, 861 N.E.2d 1083, 1088 (Ill. App. Ct. 1st Dist. 2006) (noting that "*Imbler* and its progeny outline the application of absolute immunity for a prosecutor.")

3.      Factual Basis for Orange's *Brady* Claim

Dernbach next argues that Orange's *Brady* claim cannot succeed because there is no evidence that Dernbach knew Orange's confession was either coerced or false. In *Brady v. Maryland*, the Supreme Court held that a defendant's constitutional right to due process is violated when the government fails to disclose evidence favorable to the accused and material to the question of either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation has

three components: (1) the evidence at issue must be favorable to the accused, meaning either exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice. *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). *Brady* violations implicate a defendant's right to a fair trial. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("*Newsome I*"). Because a *Brady* violation deprives the accused of his or her constitutional rights, it can form the foundation of a § 1983 claim. *Rodriguez v. Woodall*, No. 03 C 3880, 2004 WL 2583883, at *3 (N.D. Ill. Nov. 12, 2004) (Kennelly, J.) (citations omitted).

On the record now before the court, it is a disputed question of fact whether Dernbach knew of Orange's alleged torture. As discussed above, a reasonable factfinder could determine that Orange told Dernbach directly about his mistreatment at the hands of the police officers. It is also clear that Dernbach was present in and around the interrogation rooms at Area 2 at the time of Orange's alleged torture; whether Dernbach witnessed coercive techniques, heard audible shouts or screams, or otherwise had constructive knowledge of the alleged torture due to the circumstances surrounding Orange's changing "story" are questions for the factfinder. It also appears from the undisputed facts that Dernbach coached Orange in his confession, and was thus clearly aware that the confession was fabricated. Furthermore, it is undisputed that Kidd told Dernbach he had been mistreated. Dernbach had a duty to disclose his own personal knowledge of Kidd's alleged torture to Orange, in light of the fact that Kidd's confession was admitted as evidence of Orange's culpability at trial.

4.    Statute of Limitations on False Arrest Claim

Finally, for the reasons set forth in this court's August 11, 2006 Memorandum Opinion and

Order—dismissing Orange's § 1983 claim for false arrest and false imprisonment as time-barred, (*see* Dkt. No. 242)—the court dismisses Orange's state law claim for false imprisonment.

CONCLUSION

For the reasons stated above, Dernbach's Second Amended Motion for Summary Judgment (Dkt. No. 485) is granted in part and denied in part. Count VII is dismissed with prejudice. All other claims against defendant Dernbach remain pending.

ENTER:

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: September 29, 2008